IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Jeffrey Noble,<br><br>Plaintiff,<br><br>v.<br><br>Town of Mooresville, North Carolina;<br>Christopher Quinn, in his individual capacity;<br>Tracey Jerome, in her individual capacity;<br>Chris Carney, in his individual capacity;<br><br>Defendants. | CASE NO.: 5:26-CV-6 |

## AMENDED COMPLAINT AND JURY DEMAND

### Introduction

1. This is a civil-rights whistleblower retaliation action brought under 42 U.S.C. § 1983 to remedy Defendants' coordinated misuse of governmental authority to silence, punish, and remove Plaintiff, Jeffrey Noble, after he reported and refused to participate in the suppression, minimization, or concealment of misconduct involving the sitting Mayor of Mooresville.

2. Plaintiff's protected activity consisted of reporting—through appropriate internal channels—the existence and contents of municipal surveillance footage, access-control logs, alarm activity, and related security records documenting the Mayor's extended after-hours occupancy of Town Hall with a female companion, the triggering of security alarms, and a resulting police response. Plaintiff also engaged in protected conduct by refusing to mischaracterize, minimize, or acquiesce in the suppression of that evidence.

3. The subject of Plaintiff's reporting was not a routine personnel matter, ordinary technical issue, or simple facilities concern. It involved misuse of municipal property, irregular after-

hours use of a secured governmental facility, breaches of building-security expectations, and conduct implicating public integrity, accountability, and the preservation and handling of official municipal evidence.

4. Rather than neutrally investigate the underlying misconduct reflected in these records, Defendants acted to contain, suppress, and control both the evidence and the narrative surrounding it. Defendants restricted internal access to the footage and related records, advanced false or pretextual explanations, shifted scrutiny away from the underlying misconduct, falsely accused Plaintiff of leaking information, subjected him to coercive and punitive investigative tactics, placed him on administrative leave, and ultimately forced his separation from employment.

5. The accusation that Plaintiff "leaked" information was false. It functioned as a pretext to discredit Plaintiff, justify intrusive investigation, and redirect scrutiny away from politically damaging conduct by a senior elected official.

6. This case is not about a leak. It is about retaliation for exposing misconduct and refusing to participate in its concealment.

7. Defendants' actions did not occur in isolation. They arose within a broader municipal pattern in which evidence implicating senior officials is restricted, managed, or suppressed, while employees with knowledge of that evidence are targeted, investigated, isolated, and removed rather than protected.

8. That pattern is corroborated by related allegations involving other Town employees, including individuals with responsibility over municipal technology systems and law-enforcement oversight, who likewise raised concerns about evidence integrity, record handling, or misconduct involving Town leadership and were thereafter subjected to retaliation or forced separation.

2 of 32

9. Public reporting and parallel litigation have further reinforced that the issues raised by Plaintiff were not imaginary, isolated, or trivial. Those developments include allegations that Town officials pressured other employees to suppress or omit records concerning the same underlying October 2024 Town Hall incident, including surveillance-related records, police-response records, and CAD messages reflecting the Town Hall alarms and responding officers' observations, and that independent scrutiny of the matter was resisted rather than invited.

10. Efforts to secure an independent investigation were further frustrated when, after review and consultation with the appropriate District Attorney, the North Carolina State Bureau of Investigation declined to initiate an investigation in the absence of a formal request by an authorized official. On information and belief, no such request was made by Town leadership despite repeated reasons to do so and repeated public calls for outside review.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

12. This Court has supplemental jurisdiction over related state-law claims, if any are asserted, pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in Iredell County, North Carolina, within the Western District of North Carolina.

## Parties

14. Plaintiff Jeffrey Noble is a resident of North Carolina and was employed by the Town of Mooresville in its Innovation and Technology Department.

3 of 32

15. Defendant Town of Mooresville is a North Carolina municipal corporation and is responsible for the policies, customs, practices, decisions, ratifications, and failures to intervene that caused the violations of Plaintiff's constitutional rights.

16. Defendant Christopher Quinn was at all relevant times a senior Town official with authority over personnel and administrative matters affecting Plaintiff's employment, including administrative leave, investigation, discipline, return-to-work restrictions, and termination-related action. He is sued in his individual capacity. Upon information and belief, Quinn's involvement was not limited to communicating a termination recommendation, but included participation in or approval of one or more adverse actions taken against Plaintiff from the inception of the retaliatory process.

17. Defendant Tracey Jerome was at all relevant times the Town Manager of Mooresville and exercised final or effectively final authority over personnel decisions, administrative investigations, employment separations, operational responses to politically sensitive incidents, and whether Plaintiff would receive any meaningful opportunity to respond to false accusations made against him. She is sued in her individual capacity. Upon information and belief, Jerome knew of Plaintiff's report, the contents and significance of the Town Hall surveillance footage, the decision to place Plaintiff on leave, the engagement of outside investigators, and the progression toward Plaintiff's removal, yet approved, authorized, directed, or knowingly failed to stop those retaliatory measures.

18. Defendant Chris Carney was at all relevant times the Mayor of Mooresville and acted under color of state law. He is sued in his individual capacity for his role in, influence over, and benefit from the retaliatory and suppressive conduct alleged herein. Upon information and belief, after learning that Town personnel had reviewed and reported the Town Hall footage and related records, Carney communicated with Town leadership, directly or indirectly,

4 of 32

regarding the incident, the employees who had knowledge of it, and the manner in which the incident and its fallout should be handled. Upon information and belief, Carney's interest in suppressing scrutiny of the October 2024 Town Hall incident and in redirecting attention toward the employees associated with that evidence was a motivating cause of the retaliatory actions taken against Plaintiff.

19. At all relevant times, Defendants acted under color of state law and within the course and scope of their authority, employment, or apparent authority.

20. Chris Lee was at all relevant times the Town's Director of Innovation and Technology and Plaintiff's supervisor, and is referenced herein as a fact witness and participant in the events giving rise to this action.

### Plaintiff's Role and Responsibilities

21. Plaintiff was employed by the Town of Mooresville in its Innovation and Technology Department.

22. In that role, Plaintiff's responsibilities included administration and support of Town Hall access-control systems, badge credentials, surveillance systems, Computer-Aided Dispatch (CAD) systems, Records Management Systems (RMS), Body Worn Camera (BWC) systems, Automated License Plate Reader (ALPR) systems, and surveillance camera systems and infrastructure.

23. As part of those responsibilities, Plaintiff routinely reviewed door-access logs, badge activity, surveillance footage, and related system records to identify unauthorized access, security risks, irregular activity, and policy violations.

24. Plaintiff's ordinary duties required him to identify and flag technical and security irregularities. They did not require him to investigate, report, evaluate, or suppress potential misconduct by elected officials; to decide whether conduct observed on Town Hall

5 of 32

surveillance systems implicated public corruption, abuse of office, or misuse of municipal property; or to participate in the concealment, minimization, or mischaracterization of evidence harmful to politically connected officials.

25. Although Plaintiff's access to the relevant systems arose through his employment, his decision to report the subject matter and significance of what he observed—and his refusal to treat the incident and its records as insignificant, nonexistent, or outside ordinary lawful handling—was not required by, compelled by, or ordinarily within the scope of his role as an IT employee. An IT employee's ordinary job duties do not include suppressing or sanitizing evidence of misconduct by elected officials, nor do they include assuming responsibility for protecting a sitting Mayor from the consequences of what official Town records reveal.

### Ticket #36967 and Discovery of Irregular Access Activity

26. On or about October 7, 2024, the Town created IT Ticket #36967 requesting modifications to door-access permissions, which required review of access-control settings and associated badge activity within the Town Hall security system.

27. On or about October 15, 2024, while working Ticket #36967 in the ordinary course of his technical responsibilities, Plaintiff reviewed badge-access logs associated with Town Hall access activity.

28. During that review, Plaintiff identified irregular after-hours entries associated with the Mayor's credentials.

29. The badge-access records reflected entry into Town Hall shortly after midnight on or about October 10, 2024, well outside normal business hours and under circumstances inconsistent with ordinary authorized use of the building.

30. The timing, character, and duration of the access activity caused Plaintiff concern because it suggested prolonged after-hours occupancy of a secured municipal facility by or through the

credentials of the sitting Mayor under circumstances not consistent with ordinary governmental use.

### Surveillance Footage Reviewed by Plaintiff

31. Plaintiff reviewed the Town Hall surveillance footage corresponding to the access-log activity.

32. The footage showed Mayor Chris Carney entering Town Hall after midnight accompanied by an adult woman who was not readily identifiable to Plaintiff as a Town employee.

33. The footage further showed extended after-hours occupancy—approximately four and a half hours—within the building, including movement through secured and non-public areas of Town Hall, including areas associated with the third-floor management suite.

34. Plaintiff observed conduct on the footage that was inconsistent with any legitimate governmental purpose, inconsistent with ordinary use of a secured municipal building after hours, and inconsistent with Town ethics, security, and facility-use expectations.

35. Among other things, Plaintiff observed Mayor Carney walking through Town Hall hallways for a extended period of time in a state of undress—specifically without pants and with his penis exposed—while moving through secured, non-public areas of the building after midnight. The footage further reflected conduct of a personal and intimate nature occurring within a municipal facility and wholly unrelated to any legitimate governmental function. The duration, location, and nature of the conduct, occurring within restricted areas of Town Hall and captured on official surveillance systems, raised immediate concerns regarding misuse of public property, building security, and the integrity of Town facilities.

36. During the same general period, motion detectors were triggered within Town Hall, and Mooresville Police Department officers responded to the building.

37. During or around the police response, the woman accompanying Mayor Carney retreated into the Mayor's office. Upon information and belief, the woman—later identified as Jamie Gatton—was in a state of partial undress as well.

38. Despite the circumstances reflected on the footage and the alarm-triggered police response, responding officers did not enter or inspect the Mayor's office even though surrounding areas were searched or checked, thereby leaving unexamined the very location into which the companion retreated.

39. The synchronized access records, surveillance footage, alarm activity, and police response caused Plaintiff to reasonably believe that the incident involved far more than a routine false alarm or innocuous after-hours building use.

40. Plaintiff later learned that the woman accompanying Mayor Carney was Jamie Gatton, a communications consultant who, upon information and belief, was being paid by, contracting with, or otherwise providing compensated services to the Town at or around the relevant time.

41. The apparent involvement of a Town-paid or Town-affiliated consultant in the after-hours Town Hall incident substantially increased Plaintiff's concern that the matter implicated not merely security irregularities, but also misuse of municipal facilities, public-integrity concerns, irregular treatment by responding officials, and conduct warranting scrutiny rather than concealment.

### Plaintiff's Internal Reporting and Protected Conduct

42. Plaintiff did not disseminate the surveillance footage publicly and did not provide the footage, access-control records, or related municipal evidence to any media outlet.

8 of 32

43. Beginning on or about October 15, 2024, Plaintiff reported his findings internally through appropriate channels, including to supervisory personnel within the Town's Innovation and Technology Department.

44. Plaintiff reported, in substance, that the synchronized access-control records, surveillance footage, alarm activity, and police response reflected serious irregularities involving after-hours use of a secured municipal building by the sitting Mayor and an adult companion.

45. Plaintiff reasonably believed that the incident implicated misuse of municipal property, breaches of building security, ethical concerns, irregular handling of a police response, and matters of substantial public concern involving governmental integrity, accountability, and the proper preservation and handling of official records.

46. Although Plaintiff's technical role gave him access to the relevant systems and records, the subject matter and significance of what he reported extended beyond routine IT troubleshooting, facilities support, or ordinary maintenance work. Plaintiff's reporting concerned potential misconduct by elected leadership, the misuse of a secured governmental facility, and the integrity of municipal evidence.

47. Plaintiff's ordinary job duties did not require him to suppress, sanitize, mischaracterize, or minimize evidence harmful to politically connected officials, nor did they require him to disregard misconduct revealed by official Town systems. Plaintiff's reporting and refusal to participate in concealment were therefore not merely routine IT functions, but protected conduct addressing matters of public concern.

48. Plaintiff further engaged in protected conduct by refusing to mischaracterize, minimize, conceal, delete, omit, or treat the incident and its related records as insignificant, nonexistent, or outside ordinary lawful handling.

### Suppression and Containment of the Video Evidence

9 of 32

49. Following Plaintiff's report, Town leadership restricted access to the surveillance footage and limited which Town personnel, police personnel, and other officials could be informed of or briefed on its contents.

50. On or about October 17, 2024, shortly after Plaintiff's internal report, Mayor Carney took a multi-week leave of absence that continued until approximately November 12, 2024.

51. In or around November 2024, WBTV submitted a formal public-records request seeking Town Hall surveillance footage and related records for the relevant time period.

52. Upon information and belief, after WBTV requested Town Hall surveillance footage and related records, Town officials, agents, and/or counsel participated in selectively withholding, removing, omitting, or otherwise limiting responsive materials, including police-response records, CAD records, and CAD messages relating to the Town Hall alarms and responding officers' observations, including materials that would have reflected what responding personnel observed, how the alarm event was characterized internally, and facts tending to corroborate the seriousness and irregularity of the incident rather than the benign narrative later advanced by Town leadership.

53. Upon information and belief, former Town Director of Innovation and Technology Chris Lee has stated publicly that Town Attorney Sharon Crawford directed him to remove or omit certain reports and CAD notes generated by responding officers in connection with the Town Hall false alarms, and that responsive materials were removed more than once from the Town's production process.

54. Upon information and belief, public reporting and related litigation have further reflected allegations that Town officials sought to determine whether the video or related records could be deleted, suppressed, or otherwise prevented from reaching public scrutiny.

55. If true, such conduct was consistent with the Town's broader internal handling of the incident. Rather than preserve, review, and disclose the relevant evidence in a neutral and accountable manner, Town leadership and their agents focused on controlling access to records, limiting scrutiny, and suppressing information damaging to senior officials.

56. The Town admitted that the surveillance footage existed but refused to produce it, asserting broad and pretextual exemptions under the North Carolina Public Records Act.

57. The Town's refusal became the subject of separate state-court litigation in Iredell County, File No. 25CVS002134-480, in which the Town acknowledged, among other things, the Mayor's after-hours entry into Town Hall, the police response to Town Hall alarms, and the existence of the surveillance system.

58. In that litigation, the Town argued that release of the Town Hall surveillance footage would create a security risk by allowing the building and non-public areas of Town Hall to be "reverse engineered" from the videos.

59. On or about March 17, 2026, however, WBTV investigative reporter David Hodges submitted a sworn affidavit stating that, within minutes of the hearing at which the Town made that argument, he accessed the Town's publicly available permit portal and located approved Town Hall plans and drawings showing detailed floor plans, office locations, ingress and egress points, and security-related information, including areas labeled "VAULT" and "SEC/FILES," as well as electrical, fire-alarm, and CCTV-related details.

60. Upon information and belief, those facts further support the inference that the Town's asserted security rationale for withholding the footage was selective, pretextual, and consistent with a broader effort to control access to evidence reflecting misconduct by senior officials.

11 of 32

61. On information and belief, the Town's external litigation posture mirrored its internal handling of the incident: rather than pursue a neutral inquiry into the conduct reflected in the records, Town leadership focused on controlling access to the evidence, limiting dissemination of its contents, and suppressing scrutiny of the underlying events.

62. This pattern of restriction and suppression was not isolated to Plaintiff. On information and belief, other Town employees who possessed knowledge concerning the same incident, related records, or related evidence-integrity issues were likewise subjected to retaliation, separation, or pressure after raising concerns about record handling, evidence preservation, or misconduct involving Town leadership.

63. On information and belief, despite repeated reasons and repeated public calls to seek an outside inquiry, Town leadership did not initiate a formal request for an independent SBI investigation into the underlying conduct and related record-handling concerns, thereby helping ensure that the matter remained under internal control.

### Retaliation Against Plaintiff

64. As public and internal scrutiny of the Town Hall incident increased, Defendants shifted focus away from the Mayor's conduct and toward Plaintiff.

65. Plaintiff was falsely accused, without evidence, of leaking information to the media.

66. The "leak" accusation was false and functioned as a pretext to discredit Plaintiff, justify intrusive investigation, and redirect attention away from the Mayor's conduct, the alarm-triggered police response, and the evidence Plaintiff had reported.

67. Plaintiff was placed on administrative leave and subjected to escalating restrictions, isolation, and intimidation.

68. Upon information and belief, Defendant Quinn participated in, approved, or facilitated one or more adverse employment actions against Plaintiff, including the decision to place

12 of 32

Plaintiff on leave, restrictions on his work access and duties, the progression of the investigative process, and the communication of the Town's termination decision or effectively final termination recommendation.

69. Upon information and belief, Defendant Jerome knew of Plaintiff's report, the contents and significance of the Town Hall surveillance footage, the decision to place Plaintiff on leave, the engagement of US ISS, and the movement toward Plaintiff's removal, yet approved, authorized, directed, condoned, or knowingly failed to stop the retaliatory process.

70. Upon information and belief, Defendant Carney, after learning that Town personnel had reviewed and reported the Town Hall footage and related records, communicated with Town leadership directly or indirectly concerning the incident, the employees who had knowledge of it, and the handling of the fallout, and his interest in suppressing scrutiny of the incident was a motivating force behind the retaliatory focus placed on Plaintiff.

71. On information and belief, the decision to target Plaintiff was not the product of a neutral fact-finding process, but part of a retaliatory effort to punish Plaintiff for reporting politically damaging misconduct and to deter further disclosure by others.

### Coercive "Administrative" Investigation

72. On or about June 17, 2025, Plaintiff was compelled to attend an "administrative interview" conducted by US ISS, a third-party investigator retained by the Town, in Mecklenburg County.

73. Present at the interview were US ISS investigators, a Mooresville Police Department detective, and a police K-9 unit.

74. Plaintiff was informed that he was required to answer questions as a condition of his employment, and was prohibited from recording the interview.

13 of 32

75. Plaintiff had not been provided advance notice of the specific allegations against him sufficient to allow meaningful preparation for the interview or a fair opportunity to respond to the accusations.

76. During the interview, Plaintiff was accused of leaking information. Plaintiff denied those accusations and reiterated that he had never released the surveillance footage to the media or to any unauthorized person. Investigators advised Plaintiff that approximately three terabytes of data from his work devices had been reviewed.

77. The setting, personnel, and tactics of the interview were intimidating, punitive, and coercive rather than neutral or fact-finding, including the deliberate placement of a police K-9 immediately adjacent to Plaintiff during questioning.

78. The compelled nature of the interview, the police presence, the K-9, the lack of advance notice, the prohibition on recording, the invocation of accusations attributed to outside counsel, and the use of a false "leak" narrative communicated that Plaintiff—not the misconduct reflected in the Town Hall records—had become the target of official action.

79. Upon information and belief, the accusations against Plaintiff were not confined to the interview itself, but were reduced to written investigative materials, employment-related records, personnel documentation, and/or other Town-maintained records of a kind capable of impairing Plaintiff's standing, reputation, and future employment prospects.

80. Upon information and belief, the accusation that Plaintiff was the source of the leak was communicated beyond a private interview setting to additional persons within Town government, including supervisory personnel, police personnel, administrative personnel, and/or other officials involved in employment-related decision-making, thereby contributing to Plaintiff's internal stigmatization and professional harm.

## Constructive Discharge / Separation

81. On or about July 3, 2025, Plaintiff was informed by Defendant Quinn that termination of his employment was being recommended and, upon information and belief, that the decision to remove him had effectively already been made.

82. By that point, Plaintiff had already been falsely accused of leaking information, placed on administrative leave, subjected to a coercive and punitive investigative process, isolated from his ordinary work functions, deprived of any meaningful assurance that the process being used against him was neutral or fair, and given no realistic basis to believe he would be restored to his position under lawful conditions.

83. Plaintiff had also been stigmatized internally, and upon information and belief in written records and employment-related documentation, by the false narrative that he had improperly disclosed confidential information, thereby damaging his professional standing, credibility, and future employability.

84. The cumulative effect of Defendants' conduct left Plaintiff with no realistic or meaningful path back to his employment under fair conditions.

85. A reasonable employee in Plaintiff's position, having been accused without evidence, placed on indefinite leave, subjected to coercive investigative tactics, and informed that termination had been recommended or effectively decided, would have understood that continued employment was no longer realistically available and that separation was the intended outcome of Defendants' conduct.

86. Plaintiff's separation was therefore not voluntary in any meaningful sense, but was the foreseeable and intended result of Defendants' retaliatory actions.

87. To the extent Defendants contend Plaintiff was not formally terminated, Plaintiff alleges in the alternative that Defendants deliberately made his working conditions and employment

status so intolerable, coercive, and professionally ruinous that his separation constituted constructive discharge.

## Municipal Policy, Custom, and Ratification

88. The retaliatory and unconstitutional actions taken against Plaintiff were undertaken pursuant to the Town's policies, customs, practices, and ratification by final policymakers.

89. Those policies, customs, and practices included, but were not limited to: tolerating, shielding, or protecting misconduct by politically connected officials; restricting, suppressing, controlling, omitting, or selectively disclosing evidence reflecting official wrongdoing; retaliating against employees who report misconduct involving Town leadership; and using police, administrative, and outside investigative resources to discredit and punish employees rather than to neutrally investigate the underlying misconduct.

90. The Town, through its senior officials and final policymakers, failed to meaningfully investigate or address the misconduct reported by Plaintiff, while instead permitting, directing, approving, or ratifying the use of municipal resources to target Plaintiff after he reported it.

91. Defendant Jerome, as Town Manager and final or effectively final policymaker with authority over personnel decisions, investigations, and administrative responses affecting Town employees, was informed of Plaintiff's report, the significance of the Town Hall surveillance footage, the placement of Plaintiff on administrative leave, the engagement of US ISS, and the progression toward Plaintiff's removal. Jerome had the authority to halt the retaliatory process, direct a neutral inquiry into the underlying misconduct, ensure Plaintiff a meaningful opportunity to respond, or prevent the misuse of Town resources against him, but failed to do so. Her approval of, acquiescence in, or failure to stop the retaliatory measures constituted ratification of the unconstitutional conduct.

92. The Town's response to Plaintiff's report—restricting access to the footage, limiting dissemination of its contents, shifting focus to Plaintiff, approving coercive investigative tactics, advancing toward Plaintiff's removal rather than toward neutral inquiry, and resisting independent outside scrutiny—was consistent with a municipal custom of protecting politically connected officials while punishing employees who report misconduct.

93. The Town used police, investigative, and administrative resources not to impartially examine the Mayor's conduct, but to protect the Mayor, manage politically damaging evidence, and punish the employee who reported the misconduct and refused to participate in its concealment.

94. This custom and practice is further evidenced by related allegations involving other Town employees who raised concerns regarding the same incident, related records, evidence handling, or misconduct involving senior Town leadership and who were likewise subjected to retaliation, separation, or adverse treatment after doing so.

95. The Town's policies, customs, practices, and ratification were the moving force behind the constitutional violations and damages suffered by Plaintiff.

## CLAIMS FOR RELIEF

### First Claim for Relief:

### First Amendment Retaliation (42 U.S.C. § 1983)
*(Against Defendants Town of Mooresville, Christopher Quinn (individual capacity), Tracey Jerome (individual capacity), and Chris Carney (individual capacity))*

96. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

97. Plaintiff engaged in speech and conduct protected by the First Amendment when he reported, through appropriate internal channels, matters of significant public concern, including misuse of municipal property, irregular after-hours use of a secured governmental

17 of 32

facility, security breaches, irregular handling and potential suppression of municipal evidence, and potential misconduct by high-ranking Town officials.

98. Plaintiff's protected speech and conduct addressed issues of public integrity, governmental accountability, public safety, abuse of public office, and the lawful preservation, handling, and disclosure of municipal records and evidence.

99. Although Plaintiff's access to the relevant systems and records arose through his employment, the subject matter and significance of what he reported extended beyond routine technical maintenance, facilities support, or ordinary workplace administration. Plaintiff's ordinary job duties did not include evaluating or reporting misconduct by elected officials, managing the political or reputational implications of such misconduct, or suppressing evidence harmful to senior Town leadership.

100. Plaintiff's reporting of the significance of the incident, and his refusal to treat the incident and its associated records as insignificant or outside lawful handling, were not acts ordinarily within the scope of a routine IT function, but constituted protected speech and conduct addressing governmental misconduct.

101. Plaintiff further engaged in protected conduct by refusing to mischaracterize, minimize, conceal, delete, omit, or otherwise acquiesce in the suppression of the surveillance footage, access-control records, alarm activity, CAD-related information, and related evidence reflecting the Town Hall incident.

102. Defendants were aware of Plaintiff's protected reporting and his refusal to participate in concealment or narrative control concerning the incident and its related records.

103. Following and because of Plaintiff's protected activity, Defendants subjected Plaintiff to materially adverse actions, including but not limited to false accusations of

18 of 32

leaking confidential information, placement on administrative leave, restriction of duties and system access, professional isolation, coercive and punitive investigative tactics, reputational smearing, progression toward termination, and Plaintiff's eventual forced separation from employment.

104. The adverse actions taken against Plaintiff, individually and collectively, would deter a person of ordinary firmness from engaging in similar protected speech and conduct.

105. Plaintiff's protected speech and conduct were substantial, motivating, and but-for causes of Defendants' retaliatory actions.

106. Defendants' asserted reasons for targeting Plaintiff were false, pretextual, and manufactured to discredit Plaintiff, redirect scrutiny away from the underlying misconduct and the evidence reflecting it, and deter further reporting by Plaintiff and other employees.

107. Defendant Quinn, acting under color of state law and with authority over personnel actions affecting Plaintiff, participated in, approved, or facilitated adverse employment actions against Plaintiff, including his placement on administrative leave, restriction of duties, progression of the investigative process, and communication of the Town's decision to terminate or effectively terminate Plaintiff's employment.

108. Defendant Jerome, as Town Manager and final or effectively final policymaker, knew of Plaintiff's report, the contents and significance of the Town Hall surveillance footage, and the retaliatory measures taken against Plaintiff, and nonetheless approved, authorized, condoned, or knowingly failed to stop those actions.

109. Defendant Carney, acting under color of state law and motivated by his personal and official interest in suppressing scrutiny of the October 2024 Town Hall incident, influenced, encouraged, participated in, or benefited from the retaliatory actions taken against Plaintiff after Town personnel reviewed and reported the relevant evidence.

19 of 32

110. Defendant Town of Mooresville is liable because the retaliatory actions taken against Plaintiff were carried out pursuant to municipal policies, customs, practices, and ratification by final policymakers.

111. Defendants' actions were not undertaken to advance any legitimate governmental interest, but rather to silence, punish, and retaliate against Plaintiff for reporting misconduct and refusing to participate in its concealment.

112. By these actions, Defendants violated Plaintiff's rights under the First Amendment to the United States Constitution.

113. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages, including lost income and benefits, loss of professional standing, reputational harm, emotional distress, and other compensable injuries in an amount to be determined by a jury.

### Second Claim for Relief

**Fourteenth Amendment Due Process – Stigma-Plus (42 U.S.C. § 1983)**
*(Against Defendants Town of Mooresville, Christopher Quinn (individual capacity), and Tracey Jerome (individual capacity))*

114. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

115. Defendants made, adopted, repeated, endorsed, and caused to be recorded and disseminated false, misleading, and stigmatizing accusations against Plaintiff, including accusations that Plaintiff leaked confidential information and engaged in misconduct warranting adverse employment action.

116. Those accusations were made in connection with, and contemporaneous to, Defendants' decisions to place Plaintiff on administrative leave, subject him to an adverse

20 of 32

and coercive investigation, restrict his employment duties, progress toward termination, and force his separation from employment.

117. The accusations were stigmatizing in nature because they accused Plaintiff of dishonesty, disloyalty, and professional misconduct, including improper disclosure of confidential municipal information—allegations that directly impugn Plaintiff's integrity and fitness for employment in his field.

118. The false accusations against Plaintiff were not confined to a private investigative setting. Upon information and belief, those accusations were incorporated into written investigative materials, personnel records, disciplinary documentation, and other Town-maintained records of a type that are reasonably likely to be disclosed in connection with background checks, reference inquiries, or future employment opportunities.

119. Upon information and belief, the accusation that Plaintiff was the source of the alleged leak was communicated beyond a single private interview to additional individuals within Town government and related professional circles, including supervisory personnel, administrative officials, and law-enforcement personnel, whose knowledge of such accusations foreseeably impaired Plaintiff's reputation and employability.

120. The stigmatizing accusations harmed Plaintiff's good name, reputation, honor, and integrity and imposed a substantial burden on his ability to obtain future employment in municipal technology, systems administration, security infrastructure, or related professional fields.

121. Defendants imposed tangible and material adverse employment consequences on Plaintiff in connection with those accusations, including administrative leave, exclusion from his ordinary job duties, coercive investigation, progression toward termination, and Plaintiff's eventual forced separation from employment.

21 of 32

122. Defendants did not provide Plaintiff with a meaningful name-clearing hearing before a neutral decisionmaker.

123. Plaintiff was not afforded a constitutionally adequate opportunity to review the evidence against him, confront and rebut the accusations, present exculpatory information, or clear his name in a meaningful forum before or in connection with his separation from employment.

124. The June 17, 2025 compelled administrative interview did not constitute a meaningful name-clearing hearing. It was accusatory, coercive, and punitive in nature; Plaintiff was required to answer questions as a condition of employment; he was not provided fair advance notice of the allegations; he was prohibited from recording the proceeding; and the setting included law-enforcement presence and intimidation rather than a neutral adjudicative process.

125. Defendant Quinn and Defendant Jerome, acting under color of state law and with authority over Plaintiff's employment status and the investigative process, made, adopted, approved, or allowed the dissemination of the false accusations against Plaintiff without providing constitutionally adequate process.

126. Defendant Town of Mooresville is liable because the deprivation of Plaintiff's liberty interests was carried out pursuant to municipal policies, customs, practices, and ratification by final policymakers.

127. By making, recording, endorsing, and disseminating false stigmatizing accusations in connection with Plaintiff's removal from employment, without affording constitutionally adequate process and a meaningful name-clearing opportunity, Defendants deprived Plaintiff of liberty interests protected by the Due Process Clause of the Fourteenth Amendment.

128.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered

damages, including reputational injury, loss of future employment opportunities, emotional

distress, economic harm, and other compensable injuries in an amount to be determined by

a jury.

**Third Claim for Relief:**

**Municipal Liability (Monell) (42 U.S.C. § 1983)**
*(Against Defendant Town of Mooresville)*

129.     Plaintiff incorporates by reference and realleges each and every allegation contained

in the preceding paragraphs of this Complaint as if fully set forth herein.

130.     The constitutional injuries suffered by Plaintiff were caused by official policies,

customs, practices, decisions, omissions, and ratification attributable to Defendant Town of

Mooresville.

131.     At all relevant times, the Town, through its final policymakers and senior officials,

including Defendant Jerome, maintained, enforced, tolerated, or ratified policies, customs,

and practices that included, but were not limited to:

    a.   retaliating against employees who report misconduct, misuse of public resources,

        ethical violations, or politically damaging conduct by senior or politically connected

        Town officials;

    b.   restricting, suppressing, controlling, omitting, or selectively disclosing evidence

        reflecting official wrongdoing rather than ensuring neutral preservation, review, and

        disclosure of such evidence;

    c.   using police, administrative, and outside investigative resources to protect Town

        leadership and to discredit, isolate, intimidate, or remove employees who report

        misconduct;

d. shifting scrutiny away from underlying misconduct by senior officials and toward the employees who discovered, reported, or refused to conceal the relevant evidence;

e. failing to train, supervise, or discipline Town personnel regarding whistleblower protections, constitutional rights, preservation of evidence, and the lawful handling of municipal records;

f. failing to require, initiate, or permit independent review when allegations implicate senior Town officials or politically sensitive municipal evidence;

g. ratifying retaliatory actions taken against employees whose continued employment threatened to expose, authenticate, or preserve politically damaging records; and

h. failing to request or initiate independent investigation by appropriate outside authorities, including the North Carolina State Bureau of Investigation, despite circumstances reasonably warranting such review.

132. These policies, customs, and practices were not isolated, random, or accidental. They were persistent, widespread, and reflected in the Town's handling of Plaintiff's report and, on information and belief, in the treatment of other Town employees who raised concerns regarding the same incident, related records, or evidence-integrity issues involving Town leadership.

133. On information and belief, multiple Town employees, including individuals with responsibility over municipal technology systems and law enforcement-related functions, were subjected to adverse treatment, retaliation, or forced separation after raising concerns regarding the same underlying incident, the handling of related records, or misconduct involving senior Town officials.

24 of 32

134. Defendant Tracey Jerome, as Town Manager, possessed final or effectively final policymaking authority over personnel decisions, administrative investigations, and the Town's operational response to politically sensitive incidents.

135. On information and belief, Defendant Jerome was informed of Plaintiff's report, the contents and significance of the Town Hall surveillance footage, the decision to place Plaintiff on administrative leave, the engagement of outside investigators, and the progression toward Plaintiff's removal from employment.

136. Defendant Jerome had the authority to halt the retaliatory process, direct a neutral investigation into the underlying misconduct, ensure lawful preservation and handling of the evidence, and provide Plaintiff a meaningful opportunity to respond to accusations made against him, but failed to do so.

137. Instead, Defendant Jerome approved, authorized, condoned, or knowingly failed to stop the retaliatory measures taken against Plaintiff, including restriction of access to the evidence, reliance on outside investigators to target Plaintiff, continuation of the false "leak" narrative, and the progression toward Plaintiff's removal from employment.

138. The Town's response to Plaintiff's report—restricting access to evidence, limiting dissemination, shifting focus to Plaintiff, employing coercive investigative tactics, and advancing toward Plaintiff's removal rather than toward neutral inquiry—was consistent with and carried out pursuant to the Town's policies, customs, practices, and ratification.

139. The Town's internal handling of the incident was mirrored by its external conduct, including litigation positions taken to resist disclosure of the surveillance footage and related records through asserted security justifications that were, upon information and belief, selective and pretextual. That external conduct included not only resistance to disclosure of the surveillance footage itself, but also the selective withholding, omission, or removal of

CAD messages and related police-response materials responsive to public-records requests concerning the incident.

140. The Town's failure to initiate or request an independent investigation into the underlying conduct, despite repeated reasons and public calls to do so, further reflects a custom or practice of maintaining internal control over politically sensitive matters rather than permitting independent scrutiny.

141. The Town's policies, customs, practices, decisions, omissions, and ratification were the moving force behind the violation of Plaintiff's constitutional rights.

142. As a direct and proximate result of Defendant Town's conduct, Plaintiff has suffered damages in an amount to be determined by a jury.

### Fourth Claim for Relief

### Civil Conspiracy to Violate Civil Rights (42 U.S.C. § 1983)
*(Against Defendants Quinn, Jerome, Carney, and other participating actors acting under color of state law, including coordination with non-Town participants)*

143. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

144. At all relevant times, Defendants, acting under color of state law, reached an agreement, understanding, or meeting of the minds to retaliate against Plaintiff for engaging in constitutionally protected activity and to deprive him of rights secured by the First and Fourteenth Amendments.

145. The object of the conspiracy included, but was not limited to:

   a. suppressing, restricting, or limiting access to evidence of misconduct by a politically connected official;

   b. shifting scrutiny away from that misconduct and toward Plaintiff;

   c. falsely accusing Plaintiff of leaking confidential information;

26 of 32

d. using police, investigative, and administrative authority to intimidate, isolate, and silence Plaintiff;

e. discrediting Plaintiff as a witness and employee; and

f. removing Plaintiff from his employment in retaliation for his protected conduct.

146. On information and belief, the conspiracy was motivated not by any legitimate governmental objective, but by a desire to protect senior or politically connected officials from scrutiny, prevent further disclosure of damaging evidence, and punish the employee who reported and refused to conceal that evidence.

147. On information and belief, the conspiracy extended beyond purely internal Town actors and included coordination with non-Town participants, including individuals or counsel whose accusations or communications were used to initiate, support, or reinforce the false "leak" narrative against Plaintiff, thereby avoiding the limitations of the intracorporate conspiracy doctrine.

148. In furtherance of the conspiracy, Defendants committed overt acts including, but not limited to:

a. restricting internal access to surveillance footage and related records;

b. limiting or controlling who within Town government and the Police Department could be informed of the evidence;

c. coordinating responses among Town leadership, police personnel, and outside investigators;

d. advancing, adopting, or ratifying the false accusation that Plaintiff leaked information;

e. subjecting Plaintiff to a coercive and intimidating "administrative" investigation;

f. placing Plaintiff on administrative leave;

27 of 32

g. isolating Plaintiff from his duties and professional responsibilities; and

h. recommending, forcing, or effectuating Plaintiff's termination or constructive discharge.

149. These acts were logically connected, mutually reinforcing, and temporally linked to Plaintiff's protected reporting and refusal to participate in concealment.

150. Defendants knew, or reasonably should have known, that their conduct would violate Plaintiff's clearly established constitutional rights.

151. As a direct and proximate result of Defendants' conspiratorial conduct, Plaintiff was deprived of rights secured by the First and Fourteenth Amendments to the United States Constitution.

152. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined by a jury.

## Fifth Claim for Relief

### Declaratory and Injunctive Relief (28 U.S.C. §§ 2201–2202)
*(Against All Defendants)*

153. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

154. An actual, immediate, and justiciable controversy exists between Plaintiff and Defendants concerning whether Defendants' acts, policies, customs, and practices violated Plaintiff's rights under the First and Fourteenth Amendments.

155. Defendants, acting under color of state law, engaged in conduct that retaliated against Plaintiff for protected activity, deprived him of liberty interests without due process, and resulted in the creation, maintenance, and dissemination of false and stigmatizing accusations in connection with his separation from employment.

28 of 32

156. Defendants' conduct has continuing legal consequences, including the ongoing maintenance of stigmatizing allegations in municipal records, the absence of any constitutionally adequate name-clearing process, and the continuing impairment of Plaintiff's professional reputation and employment opportunities.

157. Absent declaratory and injunctive relief, Plaintiff will continue to suffer irreparable harm for which there is no adequate remedy at law, including reputational damage, professional exclusion, and the ongoing effects of uncorrected stigmatizing governmental action.

158. Plaintiff seeks a declaration that Defendants' actions, policies, customs, and practices:

   a. constituted unlawful retaliation in violation of the First Amendment;

   b. deprived Plaintiff of liberty interests without due process of law in violation of the Fourteenth Amendment; and

   c. were undertaken under color of state law and in violation of clearly established constitutional rights.

159. Plaintiff further seeks narrowly tailored prospective injunctive relief, including:

   a. an order requiring Defendants to provide Plaintiff with a meaningful name-clearing hearing before a neutral decisionmaker;

   b. an order requiring correction, removal, or appropriate annotation of false and stigmatizing statements maintained in Plaintiff's personnel, investigative, or related records;

   c. an order prohibiting Defendants from continuing to publish, rely upon, or maintain false allegations that Plaintiff engaged in misconduct or leaked confidential information; and

29 of 32

d.  such additional prospective relief as is necessary to remedy the ongoing constitutional violations and prevent their recurrence.

160.    Declaratory and injunctive relief are necessary and appropriate to redress ongoing violations of federal law, prevent future constitutional harm, and promote governmental accountability.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants and award the following relief:

1.  That this verified pleading be accepted and treated as an affidavit for all purposes permitted by law;

2.  Declaratory relief declaring that Defendants' acts, omissions, policies, customs, practices, decisions, and ratification violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution;

3.  Compensatory damages against Defendants, jointly and severally to the extent permitted by law, including but not limited to damages for lost wages, lost employment benefits, loss of earning capacity, loss of future employment opportunities, reputational harm, emotional distress, humiliation, mental anguish, and other consequential and non-economic injuries, in an amount to be determined by the jury;

4.  Punitive damages against Defendants Christopher Quinn, Tracey Jerome, and Chris Carney, in their individual capacities, for their willful, malicious, reckless, and callous disregard of Plaintiff's federally protected rights, in an amount to be determined by the jury;

5.  Appropriate declaratory and injunctive relief, including but not limited to:

    a.  an order requiring Defendants to provide Plaintiff with a prompt, meaningful, and constitutionally adequate name-clearing hearing before a neutral decisionmaker;

b. an order requiring correction, removal, expungement, sealing, and/or appropriate annotation of false, stigmatizing, misleading, or unsupported statements maintained in Plaintiff's personnel, investigative, disciplinary, or other employment-related or Town-maintained records;

c. an order prohibiting Defendants from continuing to publish, repeat, rely upon, maintain without correction, or otherwise give effect to false allegations that Plaintiff engaged in misconduct or leaked confidential information, except as corrected or annotated by order of the Court;

d. an order requiring Defendants to cease and refrain from further retaliatory or stigmatizing conduct toward Plaintiff arising out of the matters alleged in this Amended Complaint; and

e. such additional prospective relief as may be necessary to remedy ongoing constitutional harm and prevent recurrence;

6. Reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable authority;

7. Prejudgment and post-judgment interest as allowed by law;

8. Trial by jury on all issues so triable; and

9. Such other and further relief as the Court deems just, proper, and equitable.

Dated: April 2, 2026

/s C. Christopher Adkins
C. Christopher Adkins
N.C. Bar No. 46950
Adkins Law, PLLC
9620 Sherrill Estates Road
Huntersville, North Carolina 28078
Phone: (704) 274-5677
Fax: (877) 208-7577
chris@huntersvillelawyer.com

s/ Christerfer R. Purkey

Christerfer R. Purkey
N.C. Bar No. 53584
Rech Law, PC
18125 W. Catawba Avenue
Cornelius, North Carolina 28031
Phone: (704) 228-2790
Fax: (704) 909-7410
cpurkey@rechlaw.com
*Admission in W.D.N.C. pending

*Counsel for Plaintiff*

**STATE OF NORTH CAROLINA**
**COUNTY OF** *Mecklenburg*

## VERIFICATION

**Jeff Noble**, being first duly sworn, deposes and says that he is the Plaintiff in the above action, that he has read the attached pleading and knows the contents, therein, that all matters contained therein are true of her own knowledge except as to those things alleged upon information and belief, and that those are believed to be true.

_____ (SEAL)
Jeff Noble

Sworn to and subscribed before me

This __2__ day of ___April___, __2026__.

_____
NOTARY PUBLIC

Printed Name of Notary Public: *Ashley Garcia-Zarate*

My commission expires: *12/29/2030*